THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CHARLES HORTON and LOUIS ALVAREZ, Appellants.

First Department, June 25, 1963.

*Rolon W. Reed* of counsel (*Chester L. Gray, Jr.,* and *Samuel J. Henry* with him on the brief; *Anthony F. Marra,* attorney), for Charles Horton, appellant.

*Jack S. Hoffinger* for Louis Alvarez, appellant.

*Harold Roland Shapiro* of counsel (*Frank S. Hogan, District Attorney*), for respondent.

STEUER, J. The appealing defendants were convicted after trial of murder in the second degree and each received a sentence of 20 years to life. Indicted with them were five others, two of whom were found guilty of manslaughter in the second degree, and the remaining three acquitted. The indictments arose out of the killing of Michael Farmer, a 15-year-old boy, on July 30, 1957, in Highbridge Park, which abuts Amsterdam Avenue at 174th Street.

The evidence clearly shows that a group of teen-age boys, of which the appellants were members, felt aggrieved at the conduct of the members of the Jesters, a group of boys of similar

age who resided in an area generally north of where the defendants and their friends lived. The Jesters had forcibly prevented the defendants' group (which was an amalgamation of two so-called clubs called the Egyptian Kings and the Egyptian Dragons) from swimming in the Highbridge pool. On the evening of July 30, 1957, the Egyptian group assembled in the neighborhood of 152nd Street and Riverside Park. Many of these were armed with sticks, garrison belts and the like. There was evidence that Alvarez had a long knife and Horton a machete. The group proceeded to the park. Their avowed purpose was to obtain an agreement from the Jesters to be allowed to use the pool without molestation and, failing that, to compel recognition by force. When they arrived, the area was deserted. They took up positions in the shrubbery near the paths and waited. The Farmer boy and a companion named McShane came into the area. McShane noticed some boys step out from the bushes and immediately took to his heels. He was pursued but, upon objection, the results of the chase were excluded from the record. Farmer was cornered. He admitted to being a Jester and one of the boys knocked him down. He was repeatedly struck and Alvarez stabbed him with his knife, inflicting the wound that caused death. Thereupon others struck at him, including Horton who swung at him with the machete, but whether he actually inflicted any wound is in some doubt.

While these facts are not conceded by the defendants, they were amply established, and there is no claim that the evidence did not establish defendants' guilt beyond a reasonable doubt.

Alvarez raises three assignments of error. He is of Puerto Rican origin. He claims that people of like origin were systematically excluded from the Special Jury list from which the trial jurors were picked. The same point in regard to the same jury list was raised and disposed of adversely to the defendant's claim in *People* v. *Agron* (10 N Y 2d 130, 141). It is claimed, however, that since the application in this case additional persons of Puerto Rican descent appeared on the list. However, the same situation prevails here—there was no attempt to show that any person otherwise qualified was excluded because of Puerto Rican ancestry. In a county such as New York, composed of a vast number of minority groups, it will be almost inevitable that the small number of prospective jurors called for Special Jury service will not conform in proportion to the percentage of each minority group in the population. Something more than a disparity between the respective percentages must be shown.

The second point raised by this defendant is the failure of the court to direct that prior statements of witnesses be turned over to defense counsel. Undoubtedly the statements should have been submitted to defense counsel (*People* v. *Rosario,* 9 N Y 2d 286). A question was raised as to certain statements — whether they were statements or work sheets of the District Attorney. While these documents are not narrative statements, nor in question and answer form, they appear to be notes of the answers given by the witness to certain questions, and purport to quote his exact words. Such papers are the equivalent of statements and the same rules would apply to them (*People* v. *Hawa,* 15 A D 2d 740, affd. 13 N Y 2d 718). The error is not necessarily prejudicial (*People* v. *Wilson,* 16 A D 2d 207). In accord with the procedure outlined in *People* v. *Hawa* (*supra*), we have submitted all of these papers to Alvarez' counsel, and even though Horton does not specify the failure as a ground of error, we submitted them to his counsel also. These counsel, in turn, submitted the documents to trial counsel for these defendants, and we have their comments. The most serious claimed discrepancy reported by these gentlemen is between the statement and the testimony given by one of the boys, named Ralph Lago. Lago quoted Alvarez on the trial as saying, " If I catch them I am going to stab them." The same statement appears in the District Attorney's notes of his interview, but there the word " stab " is written over the word " kill " which appeared in the original transcript. We see no significance in this. Nor do counsel make any claim in regard to it beyond that calling attention to the difference in words might serve to embarrass or upset Lago on the stand. Only one other difference — and that of even less weight — was referred to. Appellant's contention is that in a case involving a capital crime the error requires reversal regardless of prejudice. We do not find that to be the rule (*People* v. *Rosario, supra,* p. 290).

Alvarez' final assignment of error is as to the admissibility of a statement made by him in question and answer form. There is no claim that this statement was obtained by duress or that it was other than voluntary. The objection is based on the fact that 24 hours intervened between Alvarez' apprehension by the police and his arraignment. The questioning took place in that interval. It is argued that he could have been arraigned earlier, before the questioning, and, if so, would have the right to counsel at the time. The argument overlooks the realities of the situation. A great many youths were involved in the

incident and were apprehended within a few hours. The police were not eyewitnesses and investigation was essential to determine which of the youths who were in the vicinity were involved in the homicide. Alvarez' questioning was a part of that investigation. There is no showing that before it took place it was known that Alvarez was implicated in the actual killing or that a charge would be lodged against him. In every case it is possible that if there were no questioning the arraignment could be made earlier by at least the time involved in the questioning. It does not follow that where the police are in ignorance of the facts they must, at the peril of invading defendant's rights, arraign him forthwith (*Crooker* v. *California*, 357 U. S. 433, 440).

Horton argues that the evidence does not show that he inflicted the fatal wound. In a sense, the point is well taken. There is more than a reasonable doubt that any blows inflicted by Horton alone would have caused death. From this premise it is contended that this appellant's liability must rest on his aiding and abetting in the killing. However, the premise does not support the conclusion. Horton's attack on the deceased, even though he was then in a moribund condition due to the wound inflicted by Alvarez, could well have been found to be an assault with a deadly weapon with intent to kill and to have hastened or contributed to his death. However, as the jury might have found guilt based on the theory that Horton aided and abetted in the homicide, the alleged error in the charge must be considered. In one point of the charge the court misread section 2 of the Penal Law to state that one who aids or abets in the commission of a crime is a principal, whereas a proper reading would be one who aids and abets. This inadvertence was not called to the court's attention and objection is made for the first time on appeal. In any event, the court later gave detailed instructions as to the elements and consequences of a crime committed by acting in concert, which instructions are not challenged. If the jury noted the disjunctive " or " in place of the conjunctive " and ", they could not have failed to note the more specific instructions which superseded it.

Horton also objects to the receipt in evidence of a written confession, but on grounds in addition to those urged by Alvarez. He claims two specifications of error, one that the jury's finding that the confession was voluntary was against the weight of evidence and, secondly, that the instructions as to coercion were not complete. It is true that Horton testified at length as to brutal beatings by several police officers and that this, plus the

fear of further corporal punishment, induced him to confess. This testimony, if believed, would certainly invalidate the confession and make it inadmissible. However, there was very good ground for rejection of the testimony and acceptance of the denials of the officers accused by him. Actually, Horton tried to make out too good a case for coercion. He swore to an almost continuous course of savage blows to all parts of his body, being repeatedly kicked, kneed and pummeled. Yet, at the end of this ordeal he was photographed by a press photographer and examined by a physician, and no sign of a bruise or other injury was revealed by either the photograph or the examination. Nor did he prior to the trial make any complaint as to his treatment. When the extravagant testimony that he gave was considered in the light of this and of his apparently willing co-operation with the police in related phases of the investigation, it can well be seen that the jury rejected his claim on ample grounds.

His complaint based on the instructions to the jury has more substance. While the jury was properly instructed as to the consequences of physical coercion, it was not told about the equally significant effect of other forms of coercion. Of these, the record supplies evidence of two possible forms. He claims that he was not given food and that between periods of interrogation he was confined in the " pen ", a large cell crowded at the time by the presence of others whose activities were being investigated. It is claimed that this was particularly onerous due to the prevailing hot weather. While these facts do appear and, under certain circumstances, might well amount to duress, Horton's testimony does not specify them as reasons for his giving the confession. According to him, it was the fear of additional punishment that prompted his capitulation. In view of that, and in view of the fact that his counsel acquiesced to the extent that despite numerous requests on other phases of the confession there was none to enlarge the charge in this respect, no error was committed.

There was also objection to the court's charge on the necessity of corroboration of testimony of accomplices. That there was testimony from which the jury could have found corroboration, and that the principles were correctly set out by the court, does not seem to be in dispute. The objection lies in the fact that the court did not specifically enumerate the items of testimony that might be considered corroboration and did not specifically say that if the confession was found by the jury to be involuntary it could not be used as corroboration. On the

latter point, it was explicitly charged that an involuntary confession cannot be considered. On the first point, there is no legal requirement that this be done. Defendant cites two cases where it was done (*People* v. *Reddy,* 261 N. Y. 479; *People* v. *Dixon,* 231 N. Y. 111), but none to the effect that it is required.

A quotation from the latter of these two cases (p. 120) aptly disposes of the claim of error here: " By oversight or mistake, slips may occur in the progress of a long trial which may be fully and fairly corrected or may be of no consequence. This court has no disposition to exaggerate such inadvertencies into undue importance. Where defendant has on the whole had a fair trial, with no substantial error which might tend to influence the verdict appearing on the record, the Code requires: (Code Crim. Pro., § 542) and the court recognizes (*People* v. *Sprague,* 217 N. Y. 373, 379) that the judgment of conviction should be affirmed."

The verdict in this case was returned on April 15, 1958. Five years and two days later this appeal was argued. The elapsed time is inordinate, and should never have been permitted. We are somewhat at a loss in fixing the blame. The studious and able efforts that defense counsel (one of whom served by appointment) brought to this appeal would seem to belie any charge that they were derelict in their attention to it. Nor can blame be put upon the District Attorney. The case was promptly heard upon being noticed for argument, but had the appeal been ready it could have been disposed of years ago. In light of the disposition, no serious harm resulted; but had it been in any respect otherwise, the consequences might be serious indeed. If no case had been shown against either appellant, their unjustified incarceration would have been needlessly protracted. And if a new trial had been necessitated, the effect of the long lapse of time on the availability and memory of witnesses might well have resulted in a miscarriage of justice. While the court has power to entertain a motion to dismiss for lack of prosecution, pragmatic considerations render it virtually unavailable in a case of this character.

The judgments of conviction should be affirmed.

McNALLY, J. P., STEVENS, EAGER and BERGAN, JJ., concur.

Judgments of conviction unanimously affirmed.