■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RALPH SMITH, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County, rendered August 5, 1975, convicting him of criminal sale of a dangerous drug in the first degree, criminal sale of a dangerous drug in the third degree (two counts), criminal possession of a dangerous drug in the third degree and criminal possession of a dangerous drug in the fourth degree, upon a jury verdict, and imposing sentence. Judgment affirmed. The undercover officer, Detective Rogers, gave extensive testimony as to his transactions with the defendant. He stated that co-defendant, Jack Camp, introduced him to the defendant on October 10, 1972 at Putnam Ave. and Broadway in Brooklyn. The defendant left a group of

three or four men standing on the sidewalk; defendant and Detective Rogers discussed defendant's ability to supply one half to three quarters of a kilo of heroin per week. Detective Rogers then asked the defendant to provide him with a "taste", i.e., a sample of heroin. Defendant said he would bring a package to codefendant Camp's apartment. About 45 minutes later the defendant arrived with a package containing heroin. The drugs were tested by Camp. Rogers then accepted and paid for them. He left the apartment and shortly thereafter met with his backup team. They sealed and signed the package of drugs. Detective Rogers testified in similar detail as to subsequent sales made by the defendant on October 14, 1972 and November 17, 1972. Roger's testimony was corroborated by two members of the "backup" team. Officer Coefield testified that he had seen a man leaving Camp's apartment building on October 10, 1972, and he identified defendant as that man. On October 14, 1972 he observed defendant drive off from the vicinity of a hotel in the area where the next sale had occurred. On November 17, 1972 he arrested defendant as he was leaving Camp's apartment. Officer Porter, a second member of the "backup" team, identified defendant as having spoken to Detective Rogers on October 10, 1972 in the immediate vicinity of the drug sale. Two cassette tape recordings made by Detective Rogers were admitted into evidence. The first of these was an October 14, 1972 telephone conversation between Detective Rogers and the defendant. That conversation concerned the purchase of one eighth of a kilo of heroin. A purchase price of $4,300 was mentioned and a meeting between defendant and Rogers was scheduled for the consummation of the sale. Rogers testified that the voices were his and the defendant's and that defendant had a pronounced stutter. The second cassette tape was made by Detective Rogers on November 13, 1972. Defendant had telephoned Rogers and the conversation concerned a sale of three quarters of a kilo of heroin. The discussion included a conversation about the price. In addition, a recording from a Kel transmitter worn by Detective Rogers was admitted into evidence. This recording was made on November 17, 1972, the day of defendant's arrest. On this tape, defendant, Detective Rogers and codefendant Jack Camp can be heard. Defendant assured Rogers that all of them were the same thing, i.e., all the bags of heroin were the same size and quality. The defendant counted out the bags for Rogers. After the drugs were cut and tested Rogers told defendant that his man downstairs had the money and a shotgun. The defendant requested that Camp accompany Rogers to pick up the money. All of the afore-mentioned tapes were properly admitted into evidence. Because one of the parties to each of the taped conversations consented to the taping, the recordings were not "Intercepted communications" within the meaning of CPL 700.05 (subd 3), and hence the sealing safeguards of article 700 of that law were not applicable (see *People v Goldfeld*, 60 AD2d 1, 9; *People v Smith*, 58 AD2d 1005). Only after the foregoing tapes were admitted into evidence were certain wiretap tapes, made pursuant to court orders, admitted as additional evidence. Five of the six tapes involved conversations in which Detective Rogers was a participant. Since these were not "Intercepted communications" within the meaning of CPL 700.05 (subd 3), (see *People v Goldfeld, supra; People v Smith, supra; People v Simmons,* 86 Misc 2d 737, affd 54 AD2d 624), they were admissible in evidence, notwithstanding the failure of the law enforcement authorities to seal them in a timely manner. Only one of the tapes was improperly admitted. The first of the six tapes was Conversation No. 73 from Plant No. 64, between Detective Rogers and codefendant Camp. In the course of this conversation, Camp said, "All right, I am going to call my

man then." This reference to "my man" was the sole statement that could be connected with the defendant. Detective Rogers testified that he assumed that "my man" referred to a person to whom he would be introduced as a supplier. The second tape, which was inadmissible because it was the only one in which Rogers was not a participant, was Conversation No. 75 from Plant No. 64. This was between a man identified at trial by Rogers as the defendant and Jack Camp. In this conversation, Camp said to the defendant "Ah, yeah, yeah, but it's not as good as that you know that, that other thing." The defendant replied "Uh, huh." Camp then said "The broad say you know it's all right cause she said ain't as good as that uh you know that I had uh, Monday." The defendant replied, "The one I gave you (inaudible) up above." The rest of the conversation dealt with setting up a time to meet "Bubba" (Detective Rogers' cover name). The third tape was Conversation No. 76 from Plant No. 64. This was between Detective Rogers and Jack Camp. In this tape, Detective Rogers asked Camp, "Okay, Hey did you talk to your man." The conversation then turned to the quantities, types and cost of the drugs to be purchased by Detective Rogers. Finally, a place where Camp and Rogers would meet the following day was agreed upon. Detective Rogers said, "Then we'll talk all over then you're in the dark room you know get everybody straight there." As to this conversation Detective Rogers testified that the drugs he referred to were heroin and cocaine in quantities of one half ounce. The fourth tape was Conversation No. 120 from Plant No. 64. This was between Detective Rogers and Jack Camp. Rogers said, "No, I just called ah my man just now man." They established that Rogers was to meet "his man" at Camp's apartment. There was a reference to a prior conversation between Detective Rogers and defendant. The reference concerned the price of an "eight" i.e., one eighth of a kilo of heroin, and the fact that defendant and Detective Rogers had agreed to meet at Camp's apartment. The fifth tape was of Conversation No. 125 from Plant No. 64. This was between Detective Rogers and Camp. It consisted of an interchange in which Camp asked Rogers to come over to his apartment and Rogers stated that he was at the candy store and would be right over. The sixth and final tape consisted of the November 13, 1972 conversation between defendant and Rogers. The same conversation had earlier been admitted into evidence in the form of a cassette tape recording made by Rogers. Thus, only the second wiretap tape should have been excluded. The recorded conversation thereon did not specifically mention the sale of drugs. It is our opinion that this error was rendered harmless by the overwhelming weight of the legally admissible evidence, including the direct testimony of the undercover officer as to defendant's participation in drug sales, the admissible Kel transmitter and telephone tapes of conversations between Detective Rogers and the defendant concerning the sale of drugs and the other admissible wiretap evidence. Accordingly, the judgment of conviction under review should be affirmed. Damiani, J. P., Titone, Margett and Martuscello, JJ., concur.